UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEREK MACK,

　　　　Plaintiff,

v.

MARK BESSNER,
JEFFREY RUCINSKI, and
SERGEANT DANIEL MARTIN,

　　　　Defendants.

Case No. 19-cv-13234
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING IN PART RUCINSKI AND MARTIN'S
MOTION FOR SUMMARY JUDGMENT [7]**

---

In the early morning hours of November 6, 2016, Michigan State Police troopers Mark Bessner and Jeffrey Rucinski pulled over a Dodge Journey that had been traveling at 90 miles per hour in a 30-mile-per-hour zone. Derek Mack was a passenger in the Dodge. While Rucinski went to the driver's side, Bessner approached Mack. Bessner saw an open bottle of liquor in the car, told Mack he was under arrest, and ordered Mack out of the car. According to Mack, before he could exit the car, Bessner sprayed him with mace. Shortly after Mack got out of the Dodge, Michigan State Police sergeant Daniel Martin arrived on scene. Over the next minute or so the three troopers proceeded to handcuff Mack. Mack says that although he complied with the troopers' orders to put his hands behind his back, Bessner still used his taser on him four times. And, after he was handcuffed, Mack says

that the troopers pulled down his pants and underwear and took a picture of his genitals to humiliate him.

Almost three years after the incident, Mack sued Bessner, Rucinski, and Martin. Mack alleges that the three troopers used excessive force and that Rucinski and Martin also failed to stop Bessner from using excessive force, both violations of the Fourth Amendment.

Relying heavily on two videos of the incident, Rucinski and Martin (but not Bessner) have moved for summary judgment "in lieu" of answering Mack's complaint. As will be explained, the Court finds that Rucinski and Martin did not use excessive force and that no reasonable jury could find them liable for not stopping Bessner's tasings. But the two videos do not entirely contradict Mack's account that he was stripped down and photographed, and Mack swears that is what happened. So Rucinski and Martin are not entitled to summary judgment on that claim.

**I.**

**A.**

As Rucinski and Martin seek summary judgment, the Court largely presents Mack's account of what happened. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But where two videos capturing the event "blatantly contradict[]" Mack's account, the Court instead presents the facts as depicted by the videos. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

On November 6, 2016, Darryl Slater went to Mack's mother's house to visit Mack. (*See* ECF No. 9-1, PageID.116.) Slater and Mack are cousins, and the two had not seen

2

each other in over six years. (*Id.*) After the two went to the store to buy a pint of Crown Royal (an 80-proof, Canadian whisky), Slater parked his Dodge Journey in front of Mack's mother's house. (*Id.*) Mack and Slater sat in the Dodge, talking about "old times, future plans, and [Slater's] mother being in hospice care." (*Id.*) During this time, the two drank—Mack consumed a cup and a half of Crown Royal. (ECF No. 9-2, PageID.121.)

At 1:30 a.m., Slater asked Mack if he "would take a short ride with him somewhere." (ECF No. 9-1, PageID.116; ECF No. 7-7, PageID.82; ECF No. 7-2, PageID.60.) Mack offered to put the open container of Crown Royal inside his mother's house, but Slater said he was fine driving with the open container. (ECF No. 9-1, PageID.116.) About fifteen minutes into the drive, Mack began to feel like he was going to vomit. (*Id.*) He had not eaten properly and "hadn't consumed alcohol prior to that night in about a year." (*Id.*) Mack closed his eyes and nodded off in an attempt to cope with his motion sickness. (*Id.*) About ten minutes later, Slater shook Mack awake. (*Id.*) Mack recalls, "I thought he was pulling over to allow me to vomit, but in actuality, we had been pulled over by Michigan State Troopers." (*Id.*)

Troopers Jeffrey Rucinski and Mark Bessner to be specific. They were on patrol in Detroit in the early morning hours of November 6. (ECF No. 7-2, PageID.60.) And they saw a Dodge Journey traveling toward them at a high rate of speed. (*Id.*) The troopers made a U-turn and gave chase. (*Id.*) The Dodge was traveling at 90 miles per hour in a 30-mile-per-hour zone. (*Id.*) After the troopers flashed their lights and sounded their siren, the Dodge pulled over. (*Id.*) Rucinski approached the driver's side; Bessner the passenger side.

From Mack's perspective, Bessner then forced him out of the passenger seat. In particular, Mack recalls rolling down his window in an attempt to vomit and hearing a trooper yelling, "you're under arrest for open intoxicants in a motor vehicle!" (ECF No. 9-1, PageID.116.) Mack says that before he could obey the command to exit the car, Bessner sprayed him with mace. (ECF No. 9-1, PageID.116.) Mack then vomited inside the car. (ECF No. 9-1, PageID.116.) Mack recalls Bessner pulling him out of the car and vomiting a second time. (ECF No. 9-1, PageID.116.)

According to Mack, "Seconds later, [Bessner] tasered me from behind as I was asking him to give me a few seconds because I was still sick and didn't want to vomit on them." (ECF No. 9-1, PageID.116.) Mack adds, "I totally submitted to the arrest, but every time I got in position to be handcuffed, Trooper Bessner would taser me again, and was repeatedly yelling, 'stop resisting! put your hands behind your back!', while I was totally compliant with him the whole time." (*Id.*) Mack further recalls, "Bessner and the assisting officers Rucinski, Sgt. Martin, and others who have yet to be identified, continued a fictitious attempt to subdue me as I begged them to see that my hands were clearly behind my back and that I was not resisting arrest." (*Id.* at PageID.117.)

Although not entirely contradictory to Mack's account, a pair of videos, recorded from Martin's and Rucinski's dashcams, show that Mack was not "totally compliant" with Bessner "the whole time."

As relevant to the pending motion, the videos begin with this scene: Sergeant Daniel Martin's patrol car arrives on scene, and the passenger door to Slater's Dodge is open. (Martin Video at 00:38–00:42.) Mack is standing behind the passenger door facing toward

4

the front of the car. (*Id.*) It appears that the passenger-door window is open and one of Mack's hands is on the windowsill. (*Id.*) Bessner is standing directly behind Mack, facing Mack. (*Id.*) Rucinski is also standing behind Mack, but to Bessner's right. (*Id.*)

The videos then depict the events leading to Bessner's first use of his taser. Bessner orders, "put your hands behind your back, get your hands behind your back." (Rucinski Video at 02:56.) Mack responds, "my hands are behind my back" and around the same time turns toward the troopers. (Martin Video at 00:44–00:46; Rucinski Video at 02:59–03:01; *see also* ECF No. 7-6, PageID.78.) It appears that at that moment, Bessner uses his taser for the first time. (Rucisnki Video at 03:01; Martin Video at 00:46; ECF No. 7-7, PageID.82.) Mack is seen falling to the ground, while screaming "oh my god, oh my god, oh my god." (Rucinski Video at 03:02.)

The videos show that the remainder of the arrest continued to be a tense and frantic situation. Martin, who had arrived on scene later than Bessner and Rucinski, is seen joining the two troopers near Mack, who is still on the ground after being tased once. (Martin Video at 00:50; Rucinski Video at 03:04; ECF No. 7-3, PageID.67.) The troopers continue to shout, "put your hands behind your back." (Rucinski Video at 03:04–03:10.) Bessner warns, "you're going to get it again," and then two seconds after that warning, Bessner tases Mack for a second time. (*See* Rucinski Video at 03:08; ECF No. 7, PageID.82.) Mack, still on the ground, again screams, "oh my god, oh my god, oh my god." (*Id.*) For the next five or so seconds, the troopers continue to shout, "put your hands behind your back." (Rucinski Video at 03:12–03:20.) Bessner then tases Mack for a third time, again causing Mack to scream, "oh my god." (Rucinski Video at 03:20; ECF No. 7-7, PageID.82.) Mack

then rolls on the ground beside the car. (Rucinski Video at 03:22.) As Mack begins to crawl on his hands and knees, i.e., his hands are not behind his back, Bessner gets on top of Mack and puts his knee on Mack's backside. (Rucinski Video at 03:28–03:33.) The troopers continue to order, "put your hands behind your back," and Mack, now apparently face down on the ground, continues to respond, "my hands are behind my back." (Rucinski Video at 03:33–03:40.) But Mack's hands are still not behind his back. Martin is seen grabbing and pulling Mack's left arm from Mack's side to behind his back. (Rucinski Video at 03:38.) And just as Martin gets Mack's left arm behind his back, Bessner uses his taser for a fourth time. (Rucinski Video at 03:43; ECF No. 7-7, PageID.82.) After the fourth tasing, the troopers continue to shout: "put your hands behind your back, you're going to get it again." (Rucinski Video at 03:45–03:50.) Mack responds, "my hands behind my back; I swear my hands behind my back." (Rucinski Video at 03:50.) Within the next ten or so seconds, the troopers are able to handcuff Mack's hands behind his back. (*See* Rucinski Video at 04:00; ECF No. 7-6, PageID.79.) Bessner did not deploy his taser again.

The whole scene—from the moment Mack is standing behind the passenger door being ordered to put his hands behind his back to the moment when Mack is secured—is about one minute. (*See* Rucinski Video at 03:01–04:06.) The four taser deployments occurred within a 38-second span. (ECF No. 7-7, PageID.82.) During the one-minute scene, the troopers ordered Mack to put his hands behind his back over a dozen times. (*See* Rucinski Video at 03:01–04:06.)

After the troopers were able to secure Mack, they stood Mack up and searched him. According to Mack, "[the troopers] walked me out of view of the in-dash camera at which

time one of them yanked my pants down to my ankles, then yanked my underwear down to my ankles, then pulled my shirt over my face and kept me standing like that for about five to ten minutes." (ECF No. 9-1, PageID.117.) Mack adds, "As I stood the[re] basically naked, privates exposed for the world to see, bleeding from my right knee, both of my elbows, and the back of my head, the troopers ridiculed me and cracked jokes about my genitals, then one of them asked the ones who had me in their grasps to hold me there a little longer because he wanted to take a picture of it (it being my penis), and proceeded to snap a picture or pictures, as they laughed at me." (ECF No. 9-1, PageID.117.) Mack also recalls, "They . . . turned me to face the direction of my cousin's vehicle, exposing myself to him, causing me extreme humiliation." (ECF No. 9-1, PageID.117.) "Shortly after their perverted games of asking me sexually disgusting questions and sexually harassing me," Mack says, "they pulled my underwear and pants back up, then placed me in the back of a patrol vehicle[.]" (ECF No. 9-1, PageID.117.)

During booking, and over 30 minutes after the troopers engaged Mack, Mack's blood-alcohol content was 0.166. (ECF No. 7-2, PageID.62.) For a man of Mack's weight, 180 pounds (ECF No. 7-2, PageID.61), that blood-alcohol content corresponds to having seven drinks, Michigan.gov, Blood Alcohol Chart, https://perma.cc/CC67-NMZ5.

Mack was charged with having an open container of alcohol in a motor vehicle, a misdemeanor, and for resisting or obstructing a police officer, a felony. (ECF No. 7-2, PageID.62.) It appears that Mack spent four days in jail. (ECF No. 9, PageID.113.) He ultimately pleaded guilty to attempted resisting or obstructing a police officer, a

misdemeanor, and was sentenced to 80 hours of community service and a year of probation. (ECF No. 7-8, PageID.84.)

## B.

In November 2019, almost three years after being arrested, Mack filed this lawsuit. (ECF No. 1.)

Instead of answering Mack's complaint or filing a Rule 12 motion or engaging in any discovery, Rucinski and Martin filed a motion for summary judgment "in lieu" of an answer. (ECF No. 7, PageID.28.) (Bessner did not move for summary judgment; indeed, he has not even appeared in this case.)

## II.

While nothing in the Federal Rules of Civil Procedure expressly prohibits a motion for summary judgment before answering the complaint or before discovery, it appears that the Rules' drafters did not contemplate litigation proceeding that way. The Rules say that in response to a complaint, a defendant has 21 days to either "serv[e] a responsive pleading" or file a motion "under this rule," i.e., under Rule 12. *See* Fed. R. Civ. P. 12(a)(1), (a)(4), (b). A motion for summary judgment is not a "pleading," Fed. R. Civ. P. 7(a), nor, of course, is it a motion under Rule 12. So arguably, Rucinski and Martin are in default: they have neither answered nor moved under Rule 12 within 21 days of being served with the complaint. And another part of the Rules underscores that a pre-answer motion for summary judgment is an oddity. Rule 56(d) expressly provides that a plaintiff can respond to a too-early summary-judgment motion by submitting an affidavit that implores the court to delay ruling until he or she conducts discovery.

But the procedural posture of this case is odder still: Mack has not taken this path to responding to the troopers' early summary-judgment motion. Instead of relying on Rule 56(d), Mack responded to Rucinski and Martin's motion on the merits. This may have been a tactical decision, given the reminder in Mack's response brief that, in this District, without permission from the judge, a defendant gets only one summary-judgment motion. (ECF No. 9, PageID.97); *see also* E.D. Mich. LR 7.1(c)(3).

Odd as it may be, though, the procedural posture is apparently acceptable to both sides. Rucinski, Martin, and Mack ask the Court to address the merits of Mack's constitutional claims without a single deposition being taken, without a single interrogatory propounded, or a single request for document production. So the Court will do so. It is not, however, inclined to do so twice.

With that, the standard: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### III.

Mack brings five claims under the U.S. Constitution against Rucinski and Martin: the troopers used excessive force, they failed to stop Bessner's excessive force, Martin, a supervisor, approved of Bessner's use of force, the troopers conducted an unlawful search, and the troopers misused the legal process. Rucinski and Martin seek summary judgment on all five claims.

**A.**

The Court begins with Mack's claim that Rucinski and Martin used excessive force to secure him in handcuffs, thus violating the Fourth Amendment's prohibition on unreasonable seizures. Although the historical facts—e.g., what actions the troopers took—are for the jury, the ultimate question of whether the troopers' actions amounted to excessive force is for the court. *See Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007).

In his complaint, Mack alleges that Rucinski and Martin "pounce[d]" on his stomach and that "Defendants" (presumably the plural refers to Bessner, Rucinski, and Martin) "kicked and dragged [him] on the ground." (ECF No. 1, PageID.4.) That sounds excessive.

But unsworn allegations in a complaint are not evidence, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Sweeting v. Schweigtzer*, No. 19-3930, 2020 WL 5822513, at *2 (6th Cir. July 31, 2020), and Mack's sworn statements are much more vague about Rucinski's and Martin's actions before the handcuffing. Mack's affidavit merely says, "[Rucinski and Martin] continued a fictitious attempt to subdue me as I begged them to see that my hands were clearly behind my back and that I was not resisting arrest." (ECF No. 9-1, PageID.117.) His affidavit also references "their"—apparently all of the troopers'—"vicious assault on me where I was sprayed in the face with mace and tasered four times in my back within the first four minutes and fifteen seconds of the traffic stop." (*Id.*)

Mack's affidavit fails to show that Rucinski or Martin used excessive force. It is beyond dispute that it was Bessner who used mace on Mack and that it was Bessner who tased Mack four times. (*See* ECF No. 9, PageID.116; ECF No. 7-2, PageID.61–62; ECF

10

No. 7-3, PageID.67–68; ECF No. 7-4, PageID.77–79.) So as far as Rucinski's and Martin's actions, Mack's affidavit reduces to merely accusing the two troopers of "a fictitious attempt to subdue" him and somehow participating in a "vicious assault." That is awfully vague. Without describing the actions Rucinski and Mack took (did they kick? pounce? something else?), the Court cannot conclude that the two troopers used excessive force.

Moreover, while the record is limited, other evidence cuts against Mack's position. The two dashcams captured most of Rucinski's and Martin's actions leading to Mack being secured in handcuffs. The videos show that from the time of the vehicle stop through the third tasing, Rucinski did not even touch Mack. (Martin Video at 00:45–1:17; Rucinski Video at 03:00–03:32.) True, after the third tasing, there is about a 30-second window where Rucinski's actions are partly obscured. (Martin Video at 01:17–01:42; Rucinski Video at 03:35–03:40.) But examining the portion of Rucinski's body that can be seen strongly suggests that he was not kicking, pouncing, or otherwise using excessive force against Mack. (Martin Video at 01:17–01:42; Rucinski Video at 03:35–03:40.) The videos also strongly suggest that Martin did not use excessive force. They show that Martin hardly touched Mack until after the third tasing, at which point he wrestled Mack's left arm behind his back and then got on top of Mack while Mack was face down on the ground. (Martin Video at 00:45–01:45; Rucinski Video at 03:00–04:00.) While this was certainly force, it was far from excessive.

To sum up, Mack's affidavit is vague about what Rucinski and Martin did to secure him. And against that vague affidavit, two videos strongly suggest that Martin and Rucinski

11

did not use excessive force. Thus, on this record, the Court finds that the two troopers did not use excessive force.

**B.**

Next up is Mack's claim that Rucinski and Martin failed to intervene and stop Bessner's excessive force.

Here is the law. "A police officer may be held liable for failure to intervene during the application of excessive force when[] (1) the officer observed or had reason to know that excessive force would be or was being used; and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Goodwin v. City of Painesville*, 781 F.3d 314, 328 (6th Cir. 2015) (internal quotation marks omitted). Further, "[a] reviewing court analyzes the subject event in segments when assessing the reasonableness of a police officer's actions." *Barton v. Martin*, 949 F.3d 938, 952 (6th Cir. 2020).

Combining those two rules and the summary-judgment standard, the task is to decide, for each of the five times Bessner used force—the mace and four tasings—whether a reasonable jury could find that Rucinski or Martin should have known that Bessner would use excessive force and had the opportunity and means to stop Bessner from using it.

The analysis of Rucinski's and Martin's failure to stop the use of mace is straightforward. From the videos, it appears that Rucinski was on the other side of the vehicle when Bessner deployed mace. (*See* Rucinski Video at 02:25–02:50.) If that is true, he plainly had no ability to stop Bessner. And even if Rucinski had reached the passenger side by the time Bessner used mace, Rucinski swears, "I was unaware that Trooper Bessner

12

deployed mace to get Mr. Mack out of the car." (ECF No. 7-6, PageID.78.) This testimony is not contradicted by Mack's affidavit and it is not clearly contradicted by the video. So Mack has presented no evidence to genuinely dispute Rucinski's claim that he lacked knowledge about the mace. As for Martin, the video clearly shows that he had not even arrived on scene when Bessner used mace. (*See* Martin Video at 00:30–00:43.) Thus, no reasonable jury could find that either Rucinski or Martin had "the opportunity and the means to prevent" Bessner from using mace.

The analysis of Bessner's first deployment of his taser is also straightforward. In the seconds before Bessner first tased Mack, Mack was standing behind the passenger side door with his hand on the door, and Bessner and Rucinski were standing behind Mack. (Martin Video at 00:40–00:50; Rucinski Video at 02:55–03:05.) The troopers, or Bessner at least, ordered Mack to put his hands behind his back. (*See id.*) As Mack responded that his hands were behind his back and started to turn toward the two troopers, Bessner suddenly tased Mack. (*See id.*) Bessner gave no warning. (*See id.*) As such, it would have been almost impossible for Rucinski to have both predicted Bessner's taser use and stopped it. As for Martin, it appears that he had not yet exited his vehicle when Bessner first tased Mack. But even if he had, he was not close enough to Bessner to stop him from using the taser. (Martin Video at 00:38–00:50; Rucinski Video at 02:53–03:05.) Like Rucinski, Martin could not have expected Bessner to use his taser at that moment. As such, no reasonable jury could find that Rucisnki or Martin violated the Fourth Amendment by failing to stop Bessner's first use of his taser.

And Rucinski and Martin had only slightly more opportunity to stop Bessner's second deployment of his taser. While Bessner had already used his taser once, Rucinski and Martin could by no means be certain that Bessner would use it again. And Bessner's warning, "you're going to get it again," came only two seconds before Bessner tased Mack again and so did not provide adequate notice to Rucinski or Martin. *See Barton v. City of Lincoln Park*, 726 F. App'x 361, 366 (6th Cir. 2018) ("[T]his Court has previously found that a duty to intervene did not arise where an officer gave a warning before applying a taser but other officers present did not have opportunity or means to prevent it."). The mere eight seconds between the first and second tasings, combined with the uncertainty of whether Bessner would deploy his taser again and a warning that came too late, excuses Rucinski and Martin from not stopping Bessner from deploying his taser a second time. *See Pineda v. Hamilton Cty., Ohio*, 977 F.3d 483, 493 (6th Cir. 2020) ("[O]ur caselaw suggests that an excessive use of force lasting ten seconds or less does not give a defendant enough time to perceive the incident and intervene to stop such force." (internal quotation marks omitted)).

Under a summary-judgment standard that asks whether a reasonable jury could find that Rucinski and Martin should have intervened, the third tasing presents a closer call than the first two. Bessner had already used his taser twice in an attempt to get Mack to put his hands behind his back, and the videos show that prior to the third tasing, Bessner was not convinced that Mack had put his hands behind his back. So, while past conduct is not always a good predictor of future conduct, Rucinski and Martin still had some reason to anticipate Bessner's third use of his taser even though Bessner did not give a verbal

14

warning. And unlike the eight seconds between the first and second tasing, 13 seconds passed between the second and third tasing—a bit more time for Rucinski and Martin to make a judgment call about what Bessner might do and to intervene. And, perhaps, the two troopers intervention could have been short of physically taking the taser from Bessner; maybe one of them could have simply said, "cool it with the taser" or the like. *See Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) ("This Court has implied that a realistic opportunity to intervene may exist whenever an officer could have called for a backup, called for help, or at least cautioned the excessive force defendant to stop." (internal quotation marks and alteration omitted)). So with the benefit of hindsight, perhaps Rucinski and Martin could and should have done something to try to stop the third tasing.

But the "lens of 20/20 hindsight" is not the correct way to evaluate an officer's "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Mullins v. Cyranek*, 805 F.3d 760, 765–66 (6th Cir. 2015); *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) ("We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day."). And viewing the situation through Rucinski's and Martin's eyes, the two troopers did not have a realistic opportunity to both conclude that Bessner would use his taser again and to stop him. Video shows that Mack still did not have his hands behind his back after the second tasing, and thus, was still not complying with the troopers' orders. (Martin Video at 01:00–01:06.) And even assuming that Mack's non-compliance with the troopers' orders was mere "passive resistance" that did not warrant the use of a taser, *see Eldridge v. City of Warren*,

533 F. App'x 529 (6th Cir. 2013), it would have taken Rucinski and Martin some time to realize that Mack was only passively resisting. And if Mack had been actively resisting, or started doing so, it would not have been excessive force for Bessner to tase him. *See Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505 (6th Cir. 2012) ("If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him."). Further, the videos show that Rucinski and Martin were partly preoccupied before the third tasing; rather than watching Bessner, Rucinski was ordering Mack to put his hands behind his back and pointing to the ground. (Martin Video at 01:03–01:07; Rucinski Video at 03:18–03:22.) And around the same time, Martin was partly bent over Mack, apparently attempting to get Mack to comply with the troopers' orders. (Martin Video at 01:00–01:05; Rucinski Video at 03:15–03:20.) All things considered—that Rucinski and Martin were not simply sitting back observing Bessner's actions but were themselves partly involved in the action, that Mack's failure to put his hands behind his back precluded a quick determination on whether Mack was passively or actively resisting, that the situation was fluid, that the third tasing came without verbal warning from Bessner, and that the troopers' actions are not to be judged with the benefit of 20/20 hindsight—no reasonable jury could find that Rucinski and Martin liable for failing to stop the third tasing.

That leaves Rucinski's and Martin's failure to stop Bessner's fourth use of his taser. The video shows that after the third tasing, Mack begins crawling, but Bessner is able to get atop of Mack and pin him facedown to the ground. (Rucinski Video at 03:28–03:35.) Then, after a bit of a struggle, Martin is able to pull Mack's left arm behind Mack's back,

and he too gets atop of Mack. (Rucinski Video at 03:35–03:43.) At that point, Bessner suddenly deploys his taser. Given that the situation was evolving—Mack was face down on the ground, two troopers were on top of him, and Mack's left arm had been wrestled behind his back—Rucinski and Martin would have difficulty anticipating that Bessner would use his taser yet again or that it would have been improper for Bessner to do so. Prior to Mack being subdued, in the course of these frantic 30-seconds, it was unclear what Bessner might do. That difficulty, combined with the fact that Bessner used his taser just two or so seconds after Martin had wrestled Mack's left arm behind his back, deprived Rucinski and Martin of any meaningful opportunity to take preventative action. As such, neither Rucinski nor Martin are liable for failing to stop Bessner's fourth use of his taser.

To summarize, given the short time interval between each tasing, that Mack did not fully comply with the officer's orders to put his hands behind his back despite repeated orders and prior tasings, that Mack was at least passively resisting arrest, and that the situation was fluid, no reasonable jury could find that Rucinski and Martin had the ability to both determine that Bessner was using excessive force and put a stop to it, *Goodwin*, 781 F.3d at 328. Rucinski and Martin are entitled to summary judgment on Mack's excessive force claim.

## C.

Although the Court has resolved Mack's failure-to-intervene claim, Mack makes a similar claim against Martin: he says Martin, a sergeant, is liable under the law of supervisory liability.

To prove a claim of supervisory liability under § 1983, a plaintiff must show that "the active performance of the [supervisor's] individual job function . . . directly resulted in the constitutional injury." *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 487 (6th Cir. 2020) (internal quotation marks omitted). "At minimum a plaintiff must show that a supervisory official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Id.* at 487–88 (internal quotation marks and alteration omitted).

Here, Mack argues that "Martin assisted in the unconstitutional use of force." (ECF No. 9, PageID.111.) He also argues that "Martin authorized, approved or knowingly acquiesced in the unconstitutional conduct by standing by and observing the unconstitutional use of force and failing to intervene." (*Id.*) Finally, Mack asserts that Martin's failure to take "any sort of corrective action" against Bessner shows that Martin authorized Bessner's use of excessive force. (*Id.*)

Martin is entitled to summary judgment on Mack's supervisory liability claim. As explained, Martin did not have a realistic opportunity to both decide that Bessner's use of his taser was excessive and to stop it. So Martin did not authorize or approve of Bessner's conduct by failing to intervene. As to Mack's claim that Martin failed to take corrective action, Mack cites no case law providing that a supervisor can be liable for his subordinate's unconstitutional act by failing to disapprove of the act after it occurred. And simple logic undermines Mack's corrective-action theory: had Martin taken corrective action after the incident, that might have deterred future wrongdoing by Bessner, but would not have undone the force that Bessner had already used against Mack. *See Pineda v.*

*Hamilton Cty., Ohio*, 977 F.3d 483, 496 (6th Cir. 2020) ("[Plaintiff] has not explained how [the sheriff's] later failure to investigate his one allegation [of excessive force] could have caused his earlier injury."); *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) ("A supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged the *specific incident of misconduct* or in some other way directly participated in it." (emphasis added) (internal quotation marks and alteration omitted)).

Accordingly, Martin is entitled to summary judgment on Mack's claim of supervisory liability.

### D.

Mack also asserts that Rucinski and Martin violated the Fourth Amendment after he was secured. (*See* ECF No. 1, PageID.5; ECF No. 9-1, PageID.117.) According to Mack, after he was handcuffed, the troopers walked him out of the cameras' views, yanked down his pants and underwear, pulled his shirt over his face, and kept him standing there for "about five to ten minutes." (ECF No. 9-1, PageID.117.) Mack adds, "[the troopers] ridiculed me and cracked jokes about my genitals" "and proceeded to snap a picture or pictures, as they laughed at me." (*Id.*) Because Rucinski and Martin seek summary judgment, the usual course is to accept these sworn statements by Mack as true. *Coble v. City of White House, Tenn.*, 634 F.3d 865, 868 (6th Cir. 2011).

But Rucinski and Martin assert that the Court should not follow the usual course because there is video. The two troopers argue that instead of interpreting the evidence in the light most favorable to Mack, "the Court should view the dashboard video here in the

light depicted by the videotape." (ECF No. 7, PageID.37); *see also Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 527 (6th Cir. 2018) ("[W]here, as here, there is a videotape capturing the events in question, the court must view those facts in the light depicted by the videotape.").

The troopers are partly right and partly wrong. The videos do blatantly contradict Mack's claim that he stood basically naked for "about five to ten minutes." The videos never show Mack with his pants pulled down or with his shirt pulled over his head. And between the two videos, Mack and the troopers are not visible for only a minute or so. (*See* Rucinski Video at 06:36–07:36; Martin Video at 04:20–05:20.) So the troopers are correct that the Court should not accept Mack's claim that he was naked and ridiculed for "about five to ten minutes." *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (providing that when a party's account is "blatantly contradicted by the record . . . a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

But the troopers are also partly wrong. Mack and the troopers are out of view of both cameras for about a minute, and a minute is long enough for the troopers to have pulled Mack's pants down and then take a picture. (*See* Rucinski Video at 06:36–07:36; Martin Video at 04:20–05:20.) The Court is thus not free to disregard Mack's sworn testimony that the troopers stripped him down, ridiculed him, and took a picture of his genitals. *See Coble v. City of White House, Tenn.*, 634 F.3d 865, 870 (6th Cir. 2011) ("Facts that are not blatantly contradicted by the audio recording remain entitled to an interpretation most favorable to the non-moving party. . . . Even if part of Coble's testimony is blatantly contradicted by the audio recording, that does not permit the district

court to discredit his entire version of the events."); *Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 527 (6th Cir. 2018) ("[W]here the video does not tell the whole story in a material respect, or reasonable jurors could interpret the video evidence differently, summary judgment is not appropriate." (internal quotation marks omitted)).

And assuming that Rucinski and Martin stripped Mack down, ridiculed him, and took a picture of him naked, the Court has little trouble in concluding that is an unreasonable search or seizure prohibited by the Fourth Amendment. *Cf. Salem v. Michigan Dep't of Corr.*, 643 F. App'x 526, 530 (6th Cir. 2016) ("[T]his court has held that strip searches performed in view of other inmates without a legitimate penological justification violates inmates' clearly established Fourth Amendment rights."). Further, if things happened the way Mack says they did, the troopers are not entitled to qualified immunity regardless of any factually analogous precedent. *See Jackson v. City of Cleveland*, 925 F.3d 793, 823 (6th Cir. 2019) ("The Supreme Court has recognized that officials can still be on notice that their conduct violates established law even in novel factual circumstances.").

Accordingly, the Court will not grant Rucinski and Martin summary judgment on Mack's claim that they stripped him down and took picture of his genitals.

### E.

Remaining is Mack's claim that Rucinski and Martin violated the Constitution by abusing legal process. (ECF No. 1, PageID.8–9.)

The Court questions whether Mack can pursue this claim under § 1983. In unpublished decisions, our Court of Appeals has indicated that there is no constitutional

abuse-of-process claim that can be remedied via § 1983. *Moore v. WesBanco Bank, Inc.*, 612 F. App'x 816, 823 (6th Cir. 2015) ("Moore's alleged federal abuse-of-process claim can be easily disposed of, as this court has consistently declined to recognize an abuse-of-process claim under 42 U.S.C. § 1983"). But elsewhere, the Court of Appeals has taken a softer stand: "This court has never specifically determined whether a claim for abuse of process is a cognizable constitutional claim that can be redressed pursuant to § 1983." *Voyticky v. Vill. of Timberlake, Ohio*, 412 F.3d 669, 676–77 (6th Cir. 2005). And in *Voyticky*, the Sixth Circuit provided that if an abuse-of-process claim could be pursued under § 1983, "the elements necessary to prove it would likely mirror those of state law." *Id.*

Here, because it does not affect the outcome, the Court will assume without deciding that Mack can pursue a constitutional abuse-of-process claim under § 1983. And, as the Sixth Circuit did in *Voyticky*, the Court will assume that such a claim tracks state law.

Under state law, the tort of abuse of process involves using legal process for an ulterior purpose. The tort is not the same as a claim of malicious prosecution. In making a malicious-prosecution claim, a plaintiff asserts that the defendant lacked probable cause for pursuing criminal charges. *See Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015). But in an abuse-of-process claim, the focus is not whether the was a valid basis for initiating legal proceedings against the plaintiff. Instead, the focus is on the defendant's purpose in initiating those proceedings. *See Friedman v. Dozorc*, 312 N.W.2d 585, 594 n.18 (Mich. 1981) (providing that the gravamen of an abuse-of-process claim is "'not . . . the wrongful initiation of criminal or civil proceedings; it is the misuse of process, no

matter how properly obtained, for any purpose other than that which it was designed to accomplish'" (quoting Restatement (Second) of Torts § 682 cmt. a (Am. L. Inst. 1975))); Dan B. Dobbs, Paul T. Hayden, and Ellen M. Bublick, *The Law of Torts* § 594 (2d ed.) ("The gist of the abuse of process tort is said to be the misuse of legal process primarily to accomplish a purpose for which it was not designed, usually to compel the victim to yield on some matter not involved in the suit, or to harass litigation opponents by clearly wrongful conduct."). So, "[f]or example, the [defendant] may procure an arrest of the plaintiff pursuant to a warrant and then offer to have the prosecution dismissed if the plaintiff will work in the [defendant's] fertilizer factory." *See* Dobbs, *supra*, § 594. In Michigan (and it appears to be the common law of other states as well), "a plaintiff must plead and prove (1) an ulterior purpose and (2) an act in the use of process which is improper in the regular prosecution of the proceeding." *Friedman*, 312 N.W.2d at 594.

Here, Mack says that Rucinski and Martin arrested him on the felony charge of resisting a police officer for an ulterior motive. According to Mack, there was not probable cause to charge him with a felony, only the misdemeanor of having open liquor in a vehicle. (ECF No. 9, PageID.112.) Mack says that the troopers arrested him for a felony to coerce him to plead guilty to a misdemeanor. (*Id.* at PageID.112–113.) Mack also asserts that the "purpose" of the felony arrest "was an attempt to justify the force" the troopers used against him. (*Id.* at PageID.113.)

No reasonable jury could find for Mack on his abuse-of-process claim against Rucinski and Martin. In his summary-judgment response brief, Mack (or, more likely, his counsel) argues that Rucinski and Martin arrested him for a felony for the ulterior purposes

of coercing a plea and justifying their use of force. But "an attorney's statement in a brief is not evidence." *Associacao Brasileira de Medicina de Grupo v. Stryker Corp.*, 891 F.3d 615, 621 (6th Cir. 2018). As far as evidence, Mack has not engaged in any discovery. And while Mack has filed an affidavit, the affidavit makes no mention of Rucinski's and Martin's purpose or motive for arresting him for a felony. (*See* ECF No. 9-1, PageID.116–118.) On this sparse record then, no reasonable jury could find for Mack on his abuse-of-process claim.

## IV.

For the reasons given, the Court GRANTS IN PART and DENIES IN PART Rucinski and Martin's motion for summary judgment (ECF No. 7). The motion is DENIED insofar as it seeks summary judgment on Mack's claim that the troopers violated the Fourth Amendment when they pulled down his pants and photographed him naked. The motion is otherwise GRANTED.

SO ORDERED.

Dated: January 11, 2021

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE